COMSTOCK v. GROUP OF INSTITU-TIONAL INVESTORS HOLDING FIRST AND REFUNDING MORTGAGE 5% GOLD BONDS OF MISSOURI PAC. R. CO. et al.

No. 13376.

Circuit Court of Appeals, Eighth Circuit.

Aug. 28, 1947.

Maxwell Brandwen, of New York City (Mr. William H. Biggs, of St. Louis, Mo., and Phillip I. Blumberg, of New York City, on the brief), for appellant.

Charles W. McConaughy, of New York City (W. Lloyd Kitchel, of New York City, Jacob Chasnoff, of St. Louis, Mo., and Cadwalader, Wickersham & Taft, of New York City, on the brief), for appellee Group of Institutional Investors holding First and Refunding Mortgage 5% Gold Bonds of Missouri Pac. R. Co.

Sanford H. E. Freund, of New York City (Shearman & Sterling & Wright, of New York City, on the brief), for appellee Bondholders Protective Committee, Missouri Pacific R. Co. General Mortgage.

Harry Kirshbaum, of New York City (Edwin J. Bean, of St. Louis, Mo., and John E. Stone, of New York City, on the brief), for appellee Convertible Bondholders Group.

Luther M. Walter and Helen W. Munsert, both of Chicago, Ill., for appellees Charles H. Thornton and A. J. Sevin, constituting a Protective Committee for Holders of Common Stock of Missouri Pac. R. Company.

Marion Pierce, of New York City, for Missouri Pac. R. Co., debtor.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

This appeal is taken by Andrew W. Comstock to reverse an order (No. 2604-A) entered January 22, 1946, in the proceedings for the reorganization of the Missouri Pacific, the New Orleans, Texas and Mexico Railway Company, and a number of other affiliated railroad corporations, under Section 77, 11 U.S.C.A. § 205, begun in March, 1933. The order followed upon a separate hearing by the court of certain of the separately numbered objections and claims for equitable treatment which were included among many others in the objections and plea for equitable treatment filed

by Comstock as an owner of 5¼% Missouri Pacific Secured Serial bonds secured by pledge of New Orleans stock against the plan of reorganization then before the court. The objections passed on after the separate hearing were identified as "Comstock's objection 19 and related objections dependent thereon." On consideration of the voluminous evidence adduced on the issues thereby presented, the court found the facts against the objector, and determined the plan to be fair and equitable in so far as those objections and claim of Comstock are concerned. The identified objections and claim for equitable treatment based thereon were denied and Comstock appeals.

It appears that the Missouri Pacific acquired the controlling interest in the capital stock of the New Orleans at the end of 1924 and at times relevant here owned from 58 to 93 percent of the total $15,000,000 par value of such stock, and from January 1925, until simultaneous commencement of reorganization proceedings in bankruptcy of both corporations in 1933, it managed the affairs of the New Orleans through Missouri Pacific officers who were given corresponding positions in the New Orleans corporation. An expansion program for both companies was carried on and throughout the course of operations the Missouri Pacific made advancements for improvements and betterments to the New Orleans. Some were repaid, but in February 1933, the New Orleans filed its application with the Interstate Commerce Commission under Section 20a(2) of the Transportation Act, 49 U.S.C.A. § 20a(2), showing that it was indebted to the Missouri Pacific for an accumulation of such advances over a period of years remaining unpaid in the sum of $10,355,226.78, and that it had been requested by the Missouri Pacific to issue demand notes therefor in the amount of $9,955,226.78 to the Missouri Pacific. It had partially complied by issuing one such note for $400,000.00, and one for $2,498,500, and after hearing the Commission made its finding as required by the statute,[1] 49 U.S.C.A. § 20a(2), and authorized New Orleans to issue to the Missouri Pacific a note for the remaining $7,456,726.-78. So that at the time of the bankruptcy of the New Orleans on the same date as that of the Missouri Pacific the notes of the New Orleans to the Missouri Pacific in the sum of $10,355,226.78 were outstanding and unpaid. Under authorization of the Interstate Commerce Commission, granted after hearing, the Missouri Pacific had pledged two of the notes aggregating $9,-955,226.78 as security for loans made to it by the Reconstruction Finance Corporation. An additional pledge was made to Railroad Finance Corporation.

After appointment of the trustees for the railroads and on August 29, 1938, an officer of the Missouri Pacific filed claim for that company against the New Orleans for the amount of the notes, plus an item of advancement of $210,000.00, aggregating the amount of $10,565,226.78, describing the consideration as "cash advances for operation, interest payments, etc., at various times from March 1929 to February 1933, both inclusive." The items which made up the total $10,565,226.78 were clearly specified and evidence of the validity of the debt as consideration for the notes was adduced before the Commission at an early stage of these Section 77 proceedings, and the obligation was deemed to be valid and ahead of New Orleans, stockholder interest in all of the accountings, computations and adjustments resulting in the plan of reorganization determined by the Commission and approved by the court in 1940. It has also been so considered by the Commission in the plan of reorganization before the court at the time of the hearing and order now appealed from.

---

[1] "* * * that the issue by the New Orleans, Texas & Mexico Railway Company of a note or notes in an aggregate amount not exceeding $7,456,726.78, as aforesaid, (2) is for a lawful object within its corporate purposes, and compatible with the public interest, which is necessary and appropriate for and consistent with the proper performance by it of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose." New Orleans, Texas & Mexico Railway Company Notes, Finance Docket No. 9817; 189 I.C.C. 600, 601, (1933) (R. 20839–20840).

It appears that in 1926 the Missouri Pacific issued and caused to be sold to the public its 5¼% Secured Serial Bonds in the amount of $13,156,000, secured by the pledge of $1000.00 par value of New Orleans capital stock for each $1000.00 principal amount of outstanding bonds, so that the officers who were put in charge of the affairs of both corporations came under fiduciary obligation to the creditors and the stockholders of each company to handle honestly the affairs of each.

Comstock owns some of said 5¼% Secured Serial Bonds so secured by the pledge of the New Orleans capital stock, and by virtue of his ownership of said bonds he has an interest as a creditor of the Missouri Pacific in the payment of his bonds and the interest thereon, and also an interest in the capital stock of the New Orleans pledged to secure the bonds. On November 22, 1944, he filed his objections to the plan of reorganization and plea for equitable treatment on the basis of those interests. Certain of his objections contained charges of mismanagement of the Missouri Pacific to his detriment as a bondholding creditor of that corporation, but the separately numbered objections here involved relate to wrongs which he alleges were done by the Missouri Pacific to the New Orleans to the detriment of his interest in the pledged stock of that company.

By his objections "Numbered 19 and related objections," Comstock charged that during the period when the affairs of the New Orleans were controlled by its majority stockholder the Missouri Pacific, between the end of 1924 and the bankruptcy in 1933, the Missouri Pacific management caused the New Orleans to pay dividends illegally out of capital and to improvidently declare and pay dividends unjustified by the business and condition of the New Orleans; improperly loaned money to it for the purpose of enabling it to pay dividends; involved it (New Orleans) in expansion and improperly made advancements to it and caused it to assume indebtedness growing out of expansion; caused it to be operated with unfair advantage to the Missouri Pacific and loss to itself, and generally mismanaged it and committed spoliation and waste of its property and interests to the financial detriment of the New Orleans and for the benefit of the Missouri Pacific. There is also a charge that the trustee for the New Orleans, who is also trustee for the Missouri Pacific, failed to perform his duties as trustee for the New Orleans, to the detriment of New Orleans stock interest. Although an Exhibit "A" attached to the objections assumed to set forth details, the charges remained sweeping and general in form with few exceptions.[2]

The objector prayed that the Missouri Pacific claim for $10,565,227 and interest against the New Orleans be disallowed; that it be determined that the New Orleans was not indebted to the Missouri Pacific, and in the alternative, that all claims of the Missouri Pacific against the New Orleans be subordinated in the reorganization to the New Orleans capital stock interest.

The allegations of breaches of obligations on the part of the Missouri Pacific were traversed in pleadings of other parties in interest. The main burden of producing witnesses and evidence to justify the handling of the affairs of the New Orleans by the Missouri Pacific during the period of Missouri Pacific management and to prove the $10,565,226.78 indebtedness of the New Orleans to the Missouri Pacific was carried at the trial by the Group of Institutional Investors Holding First and Refunding Mortgage Bonds of Missouri Pacific Railroad Company and The Protective Committee for the holders of general Mortgage Bonds of Missouri Pacific Railroad Company. They recognized fully the fiduciary nature of the obligation which law and equity attributed to the Missouri Pacific by reason of its pledge of the capital stock of the New Orleans to secure the 5¼% Serial Bonds while the New Orleans was under its management as majority stockholder, and that by the terms of the pledge the Missouri Pacific was entitled to receive itself only the dividends (lawfully and

---

[2] The Exhibit "A" also included excerpts from a report of a subcommittee of the United States Senate on the subject of Missouri Pacific System—Inter Company Dividends and Advances, published about July 29, 1940, which criticized Missouri Pacific management of the New Orleans.

properly declared) of the New Orleans stock and was required as to the corpus of said stock to honestly manage the corporate affairs and to exercise honest judgment and good faith to preserve the stock interest inviolate.

Comstock did not question or deny that the New Orleans had executed its negotiable promissory notes to the Missouri Pacific which were outstanding at the time of the trial drawing interest, and conceded that the Reconstruction Finance Corporation as an innocent holder thereof in pledge could hold the New Orleans for their face amount and interest, but his contention was that by reason of its wrongdoings the Missouri Pacific either had no valid claim or that such claim as it had should be subordinated to the capital stock interest. He did not assert or tender evidence to show that any specified individuals working for the New Orleans or the Missouri Pacific, or both companies, had misappropriated or wrongfully diverted to their own use any of the assets or business of the New Orleans to the detriment of stockholders. He tendered no evidence to show that the plan of Missouri Pacific system expansion, including expansion and improvement of the New Orleans, and for the financing thereof, adopted and carried through by the Missouri Pacific, was in itself fraudulent or reckless and improvident. As to the New Orleans, the plan contemplated that the Missouri Pacific would advance money to the New Orleans for betterments and additions on short time loans, and that at intervals when the indebtedness became of sufficient size bond issues would be sold to refund it. The worst of the depression came coincidentally with the time when such refunding was expected to be made and made the refunding impossible.

From testimony frankly given by himself, and on the face of the record, it clearly appears as to the case Comstock presented to the court on the objections herein involved that after the report of the Senate subcommittee which criticized the Missouri Pacific management of the New Orleans,

and in 1940, Comstock bought a few of the 5¼% Serial Bonds at about 10 cents on the dollar and then employed an accountant to make studies of the accounts, records and reports of Missouri Pacific management of the New Orleans and based his charges on the accountant's studies. He tendered no extraneous or newly discovered evidence. As the period of Missouri Pacific alleged mismanagement of the New Orleans (1925 to 1933) had expired many years before Comstock acquired his interest in New Orleans stock, a court would not ordinarily have felt obliged at his instance to try the merits of charges of mismanagement committed in long past years and claimed to be provable by contemporaneous records which were at all times accessible. It would not sanction such buying into a lawsuit.

But here the plan for Missouri Pacific reorganization was before the court to be approved or disapproved, according to whether it was or was not fair and equitable. The proposed plan included as one of its essential postulates that the New Orleans was indebted to the Missouri Pacific in a sum which with accumulated interest amounted to around eighteen million dollars. No judicial determination upon the validity of the debt had ever been made in any adversary proceedings throughout the thirteen year course of the Section 77 proceedings and bonds like Comstock's are outstanding in many hands aggregating some $13,500,000. Although the court was of opinion that not only Comstock but all other owners of the Missouri Pacific 5¼% Serial Bonds secured by New Orleans stock who had at all times trustee representation and in great part representation by counsel, had been guilty of laches in failing for so many years to assert and present proof and try out before the Commission and the court the alleged invalidity of the debt almost entirely evidenced by the notes,[3] it concluded that judicial adjudication should be made as to the debt and that the court should, and therefore it did, hear the evidence covering the whole period of management of the New Orleans by the Missouri Pacific, and it tried out the whole case

[3] There was also at all times a substantial minority stockholding interest in the New Orleans with means to keep informed of the affairs of the regulated railroad corporation.

and all the charges presented by Comstock on the merits.

The expert accountant called by Comstock produced a large number of exhibits which he had prepared from the books, records and reports of the individual companies and explained in connection with them the inferences he had drawn from his studies and expressed his opinions tending to support the Comstock charges. He centered his attack largely on that part of the accounting system of the railroads through which the New Orleans and its fourteen subsidiary railroads had been treated as a unit for financing purposes and the financial condition indicated by consolidated balance sheets. By disregarding the system character of all the Gulf Coast Lines held under New Orleans ownership he inferred a much less favorable financial position for the New Orleans than was shown by its consolidated balance sheets. He had no personal knowledge of the railroad operations or transactions covered by his testimony.

The Group of Institutional Investors Holding First and Refunding Mortgage Bonds of Missouri Pacific and The Protective Committee for the holders of General Mortgage bonds of Missouri Pacific to sustain the burden of Missouri Pacific defense called as their witnesses on the trial the railroad men who had engaged, each in his own department, in all of the transactions and railroad operations and the records made thereof throughout the period involved, and they testified of and concerning matters with which they were intimately familiar. Also Mr. William Wyer, who after his graduation from Yale and Massachusetts Institute of Technology served in railroad construction and operation for the government during World War I, and in U. S. Railroad Administration during Federal Control, and afterwards in various positions in the Division of Operations, Division of Accounts and Assistant to the Comptroller. From 1920 to 1927 he occupied important positions with the Southern Railroad Company and the Denver Rio Grande and Western, the latter being "fifty percent. owned by the Missouri Pacific so it was considered a part of the Missouri Pacific System." In February, 1929, he became Assistant to the Chairman of the Board of Directors of the Missouri Pacific who was also Chairman of the Board of the New Orleans, and later in the year he became Secretary and Treasurer of the Missouri Pacific and an officer on all the subsidiaries, except as to the Texas and Pacific he was such officers for only six years. He handled a great many of the financial matters involving the Missouri Pacific and the New Orleans under the supervision of the Chairman of the Board of the Missouri Pacific. In 1933 he started studies which have provided substantially all of the studies upon which the various plans of reorganization have been based. He was at the time of testifying the chief executive officer of the Central Railroad of New Jersey. He was thoroughly informed and conversant with the Missouri Pacific policies of system operation and of expanding and financing, and with the railroad operations and the financial transactions upon which the validity or invalidity of the debt in controversy depend, as well as the accounting and reporting system maintained for disclosing and reporting them. He had an important part in what was done, was in touch with substantially the whole course of the management of the New Orleans under attack and he gave his extensive testimony upon direct and cross examination with obvious understanding of its relevancy and importance. His testimony, supported by many accounting and summarizing exhibits, was to the effect that Missouri Pacific management of New Orleans was honest and was beneficial to New Orleans.

Judge Moore, presiding at the trial, has exercised the jurisdiction in these Section 77 proceedings through most of their course, and his questions, comments and directions reflect his close attention to and understanding of the testimony and its application through the trial. His written opinion is reported In re Missouri Pac. R. Co., D.C., 64 F.Supp. 64. His findings of facts and conclusions of law were drawn with care and thoroughness, and appear to us to be responsive to all the issues presented by the objections here involved and the evidence that was adduced, and the appellant has not called our attention to any refusal on the part of the court to make findings in respect to any other issues claimed

to have been presented. The vast extent of the railroad business carried on by the Missouri Pacific and the New Orleans during the long past period of alleged mismanagement and the intricate corporate structures of the railroads, inevitably presented most serious problems in the attempts of accountants to picture what their course of operations and financial transactions had been. The New Orleans had in some respects the character of a holding company in that it operated itself only a small fraction (around 11%) of the railroad mileage of its railroad system but owned the stocks and securities of some fourteen other railroad companies and was the only one of the group of railroads comprising its railroad system which had any relatively substantial amount of securities outstanding in the hands of the public. For financing purposes the individual roads in the group were dependent upon the New Orleans which, acting for the group in respect to financing, presented the necessary unitary functioning principal. There was fundamental controversy as to what inferences should be drawn from the available accounts to establish the true financial condition of the New Orleans at different times within the period and to establish and present the financial results of the railroad operations that were carried on. Mr. Wyer testified that the identified consolidated balance sheets compiled under direction of the Missouri Pacific and New Orleans officers were the summarizing records which were submitted to the Board of Directors to keep its members informed in the discharge of their duties. It was through the use of the consolidated balance sheets that the New Orleans and its affiliated railroads were treated as a unit in the financing of the companies throughout Missouri Pacific management. Though he could not say what went on in the minds of others, his testimony leaves no room to doubt that the Board members well understood how the computations were arrived at and that the members relied on them in the usual course of the financing of the business. He was intimately familiar with all phases of the accounting in which they culminate, and although he admitted that perfection was never attained, his testimony together with that of the railroad officers and employees who did the work, fully justified the trial court's reliance upon the consolidated balance sheets in his findings and conclusions. But the disputes and conflicts of testimony in respect to the accounts and the inferences to be drawn were all issues of fact. The court recognized fully all the burden of obligation imposed by law upon the Missouri Pacific in respect to its management of the New Orleans and that if the Comstock charges could be proved and the indebtedness in issue was invalid or ought not in equity to be enforced against New Orleans stockholders, the then pending plan of reorganization could not stand.

◼ Comstock's contention that the court erroneously put the burden of proving his charges on him rather than requiring the Missouri Pacific to proceed first to disprove them, is without merit. As the execution of the promissory notes was admitted and at least formal proof of all of the items of advancements making up the debt had been in the record of the Section 77 proceedings for many years before the hearing, the court required only that all the records of the transactions that were questioned be made available for the hearing so that there was the equivalent of a full disclosure by the Missouri Pacific before Comstock was required to proceed with his proof of the charges. In its findings the court stated the facts as it found them to be proven by the whole evidence. It found in detail and in effect that the Missouri Pacific had administered the affairs of the New Orleans in good faith to the advantage of that company; had made the advancements to it for proper purposes; had not caused dividends to be paid out of capital or improvidently in bad faith, and that the asserted indebtedness arose from advancement made by Missouri Pacific to New Orleans for betterments and additions and was valid and should be allowed in items specified, and that the plan of reorganization based as it was in part on recognition of the existence of the debt in question, was fair and equitable and comfortable to the requirements of law regarding the participation of the various classes of creditors and stockholders.

On this appeal the case is stated for the appellant in substantial disregard of the findings of the trial court and practically as though the case was here to be tried by this court de novo on the voluminous evidence. This court must decline to assume that function. We may not set aside the findings of facts which have been made by the trial court, who in this case had more than ordinary opportunity to judge of the credibility of the witnesses, unless such findings were clearly erroneous. Federal Rules Civil Procedure, rule 52(a), 28 U.S.C.A. following section 723c; General Orders in Bankruptcy Nos. 36 and 49, 11 U.S.C.A. following Section 53. Though we have considered the appeal sufficient in form to require a complete study of the record and evidence, we are forbidden by the rule to upset those findings which are supported by substantial evidence and are not clearly erroneous nor induced by error of law. Rule 52(a) is no less controlling because the conflicts of evidence upon which the trial court was required to decide were in the field of accountancy and expert opinions in that field were opposed. Our examination of the record in accordance with the rule has not disclosed any finding which lacks support in testimony of qualified and intelligent witnesses who fully understood the import of what they showed by the exhibits they vouched for or said on the witness stand.

The findings which we sustain cover many printed pages of the record, and to discuss them in connection with the contrary inferences which appellant contends should be drawn from particulars of evidence would extend this opinion to great length to no useful purpose. The Missouri Pacific's two hundred million dollar expansion and improvement plan, its plan for financing the same, the accounting system that was used and by which the directors were kept informed for management purposes, and the whole course of the management of the New Orleans is revealed in the evidence. There is also substantial evidence in the record that the war years tested the effects of the investments for the New Orleans made under Missouri Pacific management and justified them. The findings indicate the opposing contentions made on the trial and cover the particulars of the evidence and indicate the bases of the court's action.

The appellant has strenuously urged that the decision of the Supreme Court in Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 618, 59 S.Ct. 543, 88 L.Ed 669, requires reversal herein. But we think that the court there had to deal with a situation entirely different. The Supreme Court later said concerning its decision in that case as to the subordination which it there imposed on a parent corporation's claims against the subsidiary: "This was based on the equities of the case—the history of spoliation, mismanagement, and faithless stewardship of the affairs of the subsidiary by Standard to the detriment of the public investors." Pepper v. Litton, 308 U.S. 295, loc. cit. 308, 60 S.Ct. 238, loc. cit. 246, 84 L.Ed. 281. Here the trial court has found on substantial evidence an exactly contrary situation. The stock of the New Orleans has been kept intact and of recognized value through depressions which wiped out vast amounts of such securities, and on full investigation of the facts the court has found the Missouri Pacific's stewardship was faithful and there was no mismanagement or spoliation.

We find no error in the trial court's findings against Comstock in respect to his charges of dereliction of duty by the trustee of the New Orleans. Those charges were without merit. The holders of 5¼% Secured Series Missouri Pacific bonds at all times had trustee representation and many of them were being represented by counsel. The railroad records were accessible and there was no duty upon the trustee in reorganization of the New Orleans to initiate or carry on such speculative litigation as Comstock has undertaken. He properly caused studies to be made and hearings to be given parties in interest and acted impartially.

Being satisfied from our examination of the record that the findings of the trial court were not clearly erroneous and that on the facts as found the claim of Missouri Pacific was properly allowed and the objections and claim for special treatment denied, the order appealed from is affirmed.